**Opinion issued June 17, 2021**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00416-CR

———————————

**MICHAEL ANTHONY DANNA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from County Criminal Court at Law No. 3**
**Harris County, Texas**
**Trial Court Case No. 2155287**

---

## MEMORANDUM OPINION

A jury found appellant, Michael Anthony Danna, guilty of the misdemeanor

offense of driving while intoxicated ("DWI"),[1] second offense. After appellant

---

[1]    *See* TEX. PENAL CODE ANN. §§ 49.04(a), 49.09(a).

pleaded true to the allegation in an enhancement paragraph that he had been previously convicted of a felony offense, the trial court assessed his punishment at confinement for one year, suspended the sentence, placed appellant on community supervision for one year, and assessed a $1,000 fine. In his sole issue, appellant contends that the trial court erred in denying his motion to suppress evidence.

We affirm.

## Background

During a pretrial bench conference addressing the parties' motions in limine, the trial court ruled that the law enforcement officers who arrested appellant could not testify that they initially arrested appellant for the misdemeanor offense of reckless driving[2] because the State did not actually charge appellant with that offense. Appellant's counsel then presented an oral motion to suppress appellant's "first arrest for [the misdemeanor offense of] reckless driving and . . . [his] second arrest for [the offense of] DWI."

At the hearing on appellant's motion to suppress, Houston Police Department ("HPD") Officer L. Strandell testified that shortly after midnight on June 9, 2017, he and HPD Officer C. Grahmann were heading northbound on U.S. Interstate Highway 59 ("Highway 59") in a marked HPD patrol car, returning from a "prisoner

---

[2]    *See* TEX. TRANSP. CODE ANN. § 545.401(a), (b).

swap" with Fort Bend County law enforcement officers. At the time, Strandell was a law enforcement officer trainee and Grahmann was supervising his training. Strandell saw appellant's car pass his patrol car at a speed "well above the posted speed limit of 65 miles an hour." Appellant's car was also changing lanes without signaling, "weaving in and out of traffic," and "cutting other cars off." Strandell activated the patrol car's emergency lights and sirens to initiate a traffic stop. Strandell had to accelerate to "speeds in excess of 100 miles an hour" to catch up to appellant's car. Appellant exited the highway by "cutting all the way across" five lanes of traffic from the far-left lane to take the Bissonnet Street exit. Strandell followed in his patrol car. When Strandell finally "caught up" to appellant's car on the exit feeder road, he "pulled [appellant's car] over in a gas station parking lot."

After exiting the patrol car, Officer Strandell approached the driver's side of appellant's car and "asked [appellant] for his driver's license." Officer Grahmann approached the passenger's side of appellant's car. As appellant "was handing [Strandell] his driver's license, [Strandell] smelled an odor of alcohol coming from [appellant's] breath." Strandell also observed that appellant had "moderate[ly] slurred speech and . . . glassy eyes." Strandell asked appellant to step out of the car and walk to the back of the car.

When appellant was outside his car, Officer Strandell asked him "how many drinks he may have had." Appellant responded that "he had a few drinks." Officer

3

Grahmann then decided "that [they] would take [appellant] . . . to [HPD's intoxication center]" to conduct standardized field sobriety tests. Strandell did not ask appellant to perform the standardized field sobriety tests at the scene because he "was a new officer at the time" and taking appellant to the HPD intoxication center would give him an opportunity to watch a DWI technician perform the standardized field sobriety tests and help him to become "more comfortable" with administering the tests.

The law enforcement officers placed appellant in handcuffs and seated him in the back of their patrol car. Officer Strandell inventoried the contents of appellant's car and arranged for it to be towed to an impound lot. The officers then brought appellant to the HPD intoxication center, which was about a fifteen-minute drive from the location where they had arrested appellant. When they arrived at the HPD intoxication center, the officers placed appellant in a holding area and advised the DWI technician that appellant was there. About thirty to forty minutes later, the DWI technician had appellant perform the standardized field sobriety tests. Then, Strandell read appellant the required statutory warnings,[3] informed him "what may or may not happen with [his] driver['s] license," asked him if he was willing to give a breath or blood sample for testing and told him that if he refused to give a breath

---

[3]     *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a).

4

or blood sample, his license could be suspended or he could be given a more severe "penalty."

Officer Grahmann testified that he was riding with Officer Strandell in the patrol car on June 9, 2017 and had been training Strandell that day. Strandell had been employed by HPD for two months and was a probationary law enforcement officer at the time. Grahmann and Strandell were returning from Fort Bend County, Texas after transferring a suspect whom they had arrested to law enforcement officers in that jurisdiction. Traveling at a rate of about sixty-five miles per hour northbound on Highway 59, in moderate traffic, they were approaching the West Airport Boulevard exit in Harris County, Texas when Grahmann saw appellant's car speed past them "so fast it felt like [the patrol car was] sitting still." Appellant's car "was weaving in and out of traffic," and it "cut across multiple lanes of traffic" at least twice. Strandell had to accelerate to about 100 miles per hour for a few miles to "catch up" to appellant's car. When appellant approached the Bissonnet Street exit, his car "abruptly" went from the far-left lane across six lanes of traffic to the exit lane "all in one swoop." Appellant's car exited onto the feeder road approaching Bissonnet Street and stopped at the red light, where the law enforcement officers were able to catch up to the car. When the light turned green, Strandell activated the patrol car's emergency lights. Appellant's car went through the intersection, turned right into a gas station parking lot, and stopped.

After exiting the patrol car, Officer Strandell approached the driver's side of appellant's car while Officer Grahmann approached the passenger's side. Appellant was the only person in the car. The officers "pulled [appellant] out of [his] car" and Strandell arrested appellant for the misdemeanor offense of reckless driving. Grahmann then walked around to the driver's side of appellant's car, and the officers "put [appellant] in handcuffs." As he spoke with appellant, Grahmann could smell a strong odor of alcohol coming from appellant's breath. Grahmann also noticed that appellant had "[g]lassy eyes and slurred speech." At that point, based on their interaction with appellant, the officers began investigating whether appellant had committed the offense of DWI.

According to Officer Grahmann, he and Officer Strandell did not conduct "the [standardized] field sobriety tests on scene because [they] had no video equipment" in the patrol car, and at that time, they did not wear body cameras. And at the HPD intoxication center, HPD "ha[d] an entire room . . . that[] [was] . . . a controlled environment that g[ave] the person completing the [standardized field sobriety] tests the best chance possible because it[] [was] perfectly level ground, well lit, and everything else." Grahmann also decided to take appellant to the HPD intoxication center instead of calling other law enforcement officers with the "DWI task force," which consisted of HPD officers whose primary duty was performing standardized field sobriety tests, to the scene so that Strandell could gain more experience by

6

completing more of the DWI investigation than he would have if the DWI task force assumed control of the scene.

It took about thirty minutes to drive appellant in the patrol car from the gas station where he was arrested to the HPD intoxication center. The DWI technician at the HPD intoxication center began directing appellant through the standardized field sobriety tests a little more than an hour after Officers Grahmann and Strandell initiated the traffic stop of appellant's car. In Grahmann's opinion, appellant participated in the standardized field sobriety tests within a reasonable amount of time after he was transported to the HPD intoxication center.

Officer Grahmann agreed that the offense report authored by Officer Strandell accurately stated the chronology of events. He also confirmed that Strandell searched appellant before placing him in the patrol car. And Strandell completed a tow slip and had appellant's car towed. The law enforcement officers then drove appellant to the HPD intoxication center in their patrol car.

HPD evidence technician M. Skelton testified that she was trained in DWI investigation and standardized field sobriety test administration. She explained that there were three phases to a DWI investigation. The first phase, "when the [law enforcement] officer pull[s] somebody [over]," is called "vehicle in motion." The second phase is called "person contact." And the third phase, conducted by Skelton in this case, is the pre-arrest standardized field sobriety testing. The report Skelton

prepared related to appellant, a copy of which the trial court admitted into evidence at the hearing, begins at the second phase. Skelton noted "DOAB" on the report, which she explained, meant "Distinct Odor Alcoholic Beverage coming from [appellant's] breath." Generally, she uses three levels to describe the smell of alcoholic beverages coming from a person's breath: "[d]istinct, low; moderate, medium; [and] strong odor, high." If she does not smell anything, she "put[s] a line through" that section on the report. Skelton testified that she found six out of the six possible clues of impairment on the horizontal gaze nystagmus test, which was enough to proceed with the DWI investigation.

Skelton also evaluated appellant's walking, turning, balance, and speech and noted that they were "fair" on her report. She evaluated his walking, turning, and balance by conducting the walk-and-turn test and the one-leg-stand test. For walking, "fair" meant that appellant was balanced enough so that he did not stumble or fall. "Fair" also meant that appellant showed signs or clues of impairment. If he had not shown any impairment, Skelton would have struck through that section on the report. For speech, "fair" meant that appellant "wasn't mumbling," did not have a "thick slur," and Skelton "able to understand him."

Skelton explained that in the one-leg-stand test, if a person shows "less than two" clues of impairment, then the person cannot be arrested for the offense of DWI. When appellant performed the one-leg-stand test, Skelton observed three clues of

8

impairment: he "sway[ed]," he used his right arm for balance, and he "drop[ped] his foot." In the walk-and-turn test, Skelton detected two clues of impairment, observing that during the walking stage, appellant used his arms to keep his balance and could not keep his balance. Skelton recorded the clues of impairment on her report.

After Skelton finished administering the standardized field sobriety tests, Officers Grahmann and Strandell read form DIC-24[4] to appellant, and appellant consented to and gave a breath sample for testing. Skelton recorded the breath test results as "0.137/0.133."

At the conclusion of the hearing on appellant's motion to suppress, the trial court found that appellant "was not driving reckless[ly]" and, as a result, ruled that it would suppress appellant's arrest for the misdemeanor offense of reckless driving and it prohibited the law enforcement officers from using the term "reckless driving" during their testimony at trial or stating that they had arrested appellant for the misdemeanor offense of reckless driving. But the trial court denied appellant's motion to suppress his arrest for the misdemeanor offense of DWI, concluding that

---

[4] A form DIC-24 contains the information that, pursuant to statute, a law enforcement officer must provide to a suspect before requesting a blood or breath specimen. *See Brown v. State*, No. 01-12-01040-CR, 2014 WL 60965, at *3 n.1 (Tex. App.—Houston [1st Dist.] Jan. 7, 2014, no pet.) (mem. op., not designated for publication); *see* TEX. TRANSP. CODE ANN. § 724.015.

9

the law enforcement officers had probable cause to arrest appellant. The trial court ruled that:

> there was reasonable suspicion to pull the vehicle over, even if it was for speeding. The smell of alcohol, the slurred speech, the glassy eyes also gave reasonable suspicion and probable cause to proceed. In 2017, them taking him . . . to a central station an hour and two minutes later he was tested, [was] not unreasonable.

Thus, the trial court allowed evidence to be presented at trial about appellant's arrest for the misdemeanor offense of DWI and the standardized field sobriety testing and breath testing conducted at the HPD intoxication center.

## Standard of Review

We apply a bifurcated standard to review a trial court's denial of a motion to suppress evidence. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion, but we review the trial court's application of the law to the facts de novo. *Id.* At a suppression hearing, the trial court is the sole trier of fact and judge of a witness's credibility, and it may choose to believe or disbelieve all or any part of the witness's testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When, as here, a trial court does not make explicit findings of fact, we review the evidence in a light most favorable to the trial court's ruling. *Walter v. State*, 28 S.W.3d 538, 540 (Tex. Crim. App. 2000). We give almost total deference to a trial court's implied findings, especially

those based on an evaluation of witness credibility or demeanor. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.* at 447–48 & n.19.

## Motion to Suppress

In his sole issue, appellant argues that the trial court erred in denying his motion to suppress evidence because although the law enforcement officers had a reasonable suspicion to stop him for speeding, they lacked probable cause to arrest him for either the misdemeanor offense of reckless driving or the misdemeanor offense of DWI, and as a result, the trial court erred in failing to exclude from evidence the results of appellant's standardized field sobriety tests and breath test as the products of an arrest without probable cause.

A defendant moving to suppress evidence "has the burden of producing evidence that rebuts the presumption of proper police conduct." *State v. Robinson*, 334 S.W.3d 776, 778–79 (Tex. Crim. App. 2011). If the defendant shows that he was detained without a warrant, the burden shifts to the State to establish probable cause. *See Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009).

Probable cause for a warrantless arrest exists "if, at the moment the arrest is made, the facts and circumstances within the arresting [law enforcement] officer's knowledge and of which he has reasonably trustworthy information are sufficient to

11

warrant a reasonably prudent man in believing that the person arrested had committed or was committing an offense." *Id.*; *see* TEX. CODE CRIM. PROC. ANN. art. 14.01(b) ("A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view."). Probable cause must be based on specific, articulable facts rather than a law enforcement officer's mere opinion. *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005). "The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting [law enforcement] officer, and it requires a consideration of the totality of the circumstances facing the arresting officer." *Amador*, 275 S.W.3d at 878 (internal citations omitted).

Appellant asserts that, although Officers Grahmann and Strandell had a reasonable suspicion to stop him for speeding, they lacked probable cause to arrest him for either the misdemeanor offense of reckless driving or the misdemeanor offense of DWI when they transported him to the HPD intoxication center. Appellant relies on testimony of Officers Grahmann and Strandell about the types of driving behavior that they did not see from appellant and their subjective opinions about the quality of appellant's driving. But the officers also testified that they saw appellant engage in unusual and erratic driving behavior.

For instance, Officers Grahmann and Strandell stated that they saw appellant driving his car at approximately 100 miles per hour, more than thirty miles an hour

over the speed limit and an extremely high speed for driving in moderate traffic. And appellant's car was "weaving in and out of traffic" and changing lanes without signaling. Appellant's car "cut across multiple lanes of traffic" at least twice and exited Highway 59 "all in one swoop," "very abruptly and not like most people would exit the [highway]." Once appellant pulled his car over and stopped, the officers approached appellant's car, finding only appellant inside. They noticed that appellant had an odor of alcohol on his breath, his speech was slurred, his eyes were "glassy." And appellant admitted to the law enforcement officers that he "had a few drinks."

Based on the totality of the circumstances detailed in the law enforcement officers' testimony, Officers Grahmann and Strandell objectively had probable cause to arrest appellant for the misdemeanor offense of DWI after seeing him violate various traffic laws and observing the indicators of intoxication that they described. *See, e.g.*, *Clement v. State*, No. PD-0681-15, 2016 WL 4938246, at *6 (Tex. Crim. App. Sept. 14, 2016) (not designated for publication) (probable cause existed where law enforcement officer observed defendant speeding, defendant almost hit guardrail while pulling his car onto shoulder, defendant admitted to officer that he had been drinking, and defendant's breath smelled of alcoholic beverage); *Al-Hanna v. State*, No. 08-17-00037-CR, 2019 WL 156779, at *4, *7 (Tex. App.—El Paso Jan. 10, 2019, no pet.) (mem. op., not designated for publication) (probable cause existed

13

where law enforcement officer observed defendant's car revving its engine and traveling ten miles per hour over the speed limit, noticed defendant's speech was slurred, his eyes were bloodshot, and that smell of alcohol was emanating from his person); *Maxwell v. State*, 253 S.W.3d 309, 314 (Tex. App.—Fort Worth 2008, pet. ref'd) (probable cause existed where defendant was stopped by law enforcement officers for speeding at 2:00 a.m., defendant admitted he had been drinking alcohol, and defendant passed officer while speeding, weaved his car in his own lane, and failed to use turn signal when he changed lanes); *Chilman v. State*, 22 S.W.3d 50, 56 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (probable cause existed where defendant was seated in driver's seat with engine running, had slurred speech, bloodshot eyes, odor of alcohol on breath, and was evasive in responding to questions); *State v. Garrett*, 22 S.W.3d 650, 654 (Tex. App.—Austin 2000, no pet.) (probable cause existed where defendant drove through red light and made sudden turn into parking lot, and upon investigation, smelled strongly of alcohol, had watery eyes, and was unsteady on his feet). We therefore hold that the trial court did not err in denying appellant's motion to suppress evidence.

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Justices Countiss, Rivas-Molloy, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).